UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANOLITO CASTILLO,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Defendant. | Case No.: 19cv00200-JAH-RBB<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT FOR DEFENDANT** |

## INTRODUCTION

　　Plaintiff Manolito Castillo seeks damages for injuries resulting from Defendant United States of America's negligence for treatment received from the Veterans Affairs ("VA") San Diego Heath Care System. Thomas F. Friedberg appeared on behalf of Plaintiff and Steven Poliakoff and Steve Chu appeared on behalf of Defendant at trial. After hearing testimony and argument of counsel at the trial, the matter was taken under submission. The parties filed separate trial briefs following trial, responses to the other party's brief and replies. Defendant also filed a motion to dismiss which the Court denied in a separate order.

　　Having considered the testimony and argument presented by the parties at trial and the post-trial briefs, this Court makes the following findings of fact and conclusions of law:

# FINDINGS OF FACT

1. Plaintiff was 66 years old when he went to the VA Optometry Clinic in Mission Valley on March 24, 2016, for a follow-up appointment for treatment of his ophthalmological glaucoma. He was examined by Therese Nguyen, Doctor of Optometry.

2. At his appointment, Plaintiff reported a sudden change in his vision during the preceding week. Dr. Nguyen, diagnosed Plaintiff with right eye central retinal vein occlusion ("CRVO").

3. CRVOs produce a substance called vascular endothelial growth factor ("VEGF") which can result in the formation of abnormal blood vessels through a process called neovascularization. The abnormal blood vessels can block drainage from the back of the eye which increases the pressure within the eye ("intraocular pressure" or "IOP") and can compress the optic nerve, causing neovascular glaucoma. If neovascular glaucoma is not promptly treated, the visual cells of the retina can be irreversibly injured and the individual can lose all vision in that eye.

4. Dr. Nguyen was unable to complete her evaluation on March 24, 2016, due to Plaintiff's uncontrolled high blood pressure and the unavailability of equipment necessary for further evaluation at the Mission Valley clinic. Dr. Nguyen issued an order for an appointment for Plaintiff at the La Jolla VA clinic the next day for further evaluation.

5. Dr. Nguyen's evaluation of Plaintiff between March 24th and 25th included pupillary assessment for a relative afferent pupillary defect ("RAPD") (a test by which any differences in the reactivity of each of a patient's pupils to light is assessed), best corrected visual acuity, IOP of both eyes, slit lamp examination, gonioscopy to evaluate for neovascularization at the angle (the area where fluid in the eye is drained), dilated fundus examination ("DFE"), and optical coherence tomography ("OCT").

6. The evaluation demonstrated that Plaintiff did not have a RAPD or visual defect nor did he have an elevated IOP or any neovascularization. Based on the results, Dr. Nguyen concluded that Plaintiff had non-ischemic CRVO, meaning that his eye and retina were receiving sufficient oxygenated blood.

7. There are two types of CRVO, ischemic and non-ischemic. Ischemic CRVO is where the blockage of the vein causes a lack of blood flow and oxygen to the retina, causing a release of the VEGF, which in turn causes a greater lack of blood flow and oxygen. Non-ischemic CRVO is more benign, where vision is usually good and there is still blood flow to the retina, meaning the retina is not deprived of oxygen despite being blocked.

8. When a CRVO is converting from non-ischemic to ischemic, new blood vessels can be present on the iris and in the angle, or drainage system, as well. When new blood vessels are present, if left unchecked, the patient can develop rubeotic glaucoma or neovascularization glaucoma. This results in raised pressure that affects the optic nerve and will eventually lead to blindness.

9. Plaintiff's 20/20 visual acuity during Dr. Nguyen's evaluation placed him in a category of non-ischemic CRVO patients where the likelihood of neovascularization is less than 5%.

10. Dr. Nguyen developed a treatment plan following her evaluation that included a referral to the ophthalmology/retina clinic within one month. Dr. Nguyen reported that she would overbook Plaintiff's return appointment if advised to do so by a consulting ophthalmologist.

11. Dr. Nguyen advised Plaintiff that he should continue with his eye drops and return for an evaluation and treatment sooner if there were any sudden changes in his vision and/or he experienced eye pain.

12. Dr. Nguyen forwarded her plan, along with Plaintiff's fundus photos and OCT, to the Ophthalmologist/Retinal specialist, Henry Ferreyra, M.D., for consultation.

13. On March 30, 2016, after reviewing Plaintiff's records, Dr. Ferreyra found the OCT showed Plaintiff had CRVO with mild cystoid macular edema ("CME") and concurred with Dr. Nguyen's assessment.

14. Dr. Ferreyra approved Dr. Nguyen's treatment plan, advising that Plaintiff should be referred to the retina clinic for clinical correlation and repeat OCT in one month. Dr.

Ferreyra recommended Plaintiff take Avastin, an Anti-VEGF medication, if the CME worsened.

15. On March 30, 2016, Dr. Nguyen entered an order for Plaintiff to return to the clinic within one (1) month and indicated "no overbook" in the scheduling order.

16. At the time, VA schedulers required a provider's overbook order to schedule a patient into an appointment timeslot that was already filled by other patients.

17. Dr. Nguyen, an optometrist, does not overbook into ophthalmology without instruction from the consulting ophthalmologist. In this case, Dr. Ferreyra did not indicate an overbook was necessary.

18. On March 30, 2016, a VA scheduler could not reach Plaintiff by phone to book his follow-up appointment. Per VA policy, a scheduling card was mailed on April 4, 2016 to Plaintiff instructing him to call for an appointment.

19. On April 4, 2016, Plaintiff called the VA to ask about the status of his eyeglasses. During the call, Plaintiff asked about his follow-up appointment with ophthalmology and was told there was no record of an ophthalmology appointment.

20. On April 11, 2016, Plaintiff called to schedule his appointment with the ophthalmology clinic after receiving his recall reminder letter in the mail. The VA operator informed Plaintiff they had no openings until May 16, 2016, 17 days after Dr. Nguyen's return to clinic date. Plaintiff responded that he would be out of town on that date, and the operator was able to schedule Plaintiff for a May 23, 2016 appointment as the next available option.

21. The VA policy at the time allowed schedulers to offer appointments to patients up to 30 days after the return to clinic date ordered absent an overbook order. Dr. Nguyen's order for Plaintiff to return to clinic within one (1) month meant that the scheduler could schedule Plaintiff's appointment up to 30 days beyond that date.

22. In early May 2016, while in Pennsylvania, Plaintiff experienced eye redness, eye pain and loss of vision for at least a period of five (5) days before calling the VA on May

9, 2016, despite Dr. Nguyen's instruction of March 25, 2016. The VA advised Plaintiff to obtain emergency care within one to two hours.

23. Plaintiff did not obtain emergency care on May 9, 2016, as advised. Instead, Plaintiff made an appointment to be seen by an ophthalmologist, Michael Negrey, M.D., in Havertown, Pennsylvania on May 10, 2016.

24. On May 10, 2016, Dr. Negrey recorded that Plaintiff complained of his right eye being red for about 7 days and that he had lost vision that week.

25. Dr. Negrey found that Plaintiff's right eye vision was such that he could count fingers and his IOP was 54. Dr. Negrey diagnosed Plaintiff with right eye neovascular glaucoma, indicating Plaintiff's CRVO had converted from non-ischemic to ischemic and prescribed eye drops for treatment.

26. Plaintiff returned to Dr. Negrey on May 16, 2016, for a follow-up appointment and determined Plaintiff's IOP was still elevated at 46 and his vision had diminished to seeing only hand motion with his right eye. Dr. Negrey advised Plaintiff to follow-up in San Diego for evaluation as soon as he returned.

27. After Plaintiff's return to San Diego, Plaintiff called the VA on May 18, 2016, and asked to speak to any doctor at the clinic, if Dr. Nguyen was not available. He reported that his eye was bulging with a lot of pressure, and that he was experiencing sudden blindness which began after the end of April 2016. Plaintiff asked to see a doctor before his scheduled appointment, but he was not permitted to do so.

28. When Plaintiff arrived for his May 23, 2016 appointment, he was examined by Roman Fajardo, M.D., an ophthalmologist under Dr. Ferreyra's supervision.

29. Plaintiff's May 23, 2016 examination demonstrated right eye neovascularization, a right eye IOP of 47, and vision limited to hand movement with his right eye. Plaintiff was treated with an injection of an anti-VEGF treatment into his right eye to stop the progression of the neovascularization, as well as Diamox, an oral medication, and eyedrops. Plaintiff was scheduled for the glaucoma clinic 4 days later.

30. When Plaintiff was evaluated at the glaucoma clinic on May 27, 2016, the damage was such that the treatments he received were unsuccessful. Plaintiff had no light perception and was permanently blind in his right eye.

31. Duane Bryant, M.D., testified that on March 24, 2016, Plaintiff had high comorbidities that placed him at high risk of CRVO, such as his age of 55, uncontrolled blood pressure, sleep apnea, increased levels of cholesterol, heart problems, a previous ischemic stroke, and diabetes. Dr. Bryant opined that Plaintiff's fundus photographs revealed a great deal of blot hemorrhage, more than normally seen in non-ischemic CRVO, such that if Plaintiff was not already ischemic Dr. Bryant would assume Plaintiff's condition was going that way.

32. Dr. Bryant testified that on the basis of the photographs, additional testing should have been done, specifically a fluorescein angiogram in order to meet the standard of care. A fluorescein angiogram is an eye test that uses a special dye and camera to look at blood vessels at the back of the eye. Dr. Bryant opined that this test would have definitively determined whether Plaintiff's CRVO was more non-ischemic versus ischemic and failure to order this test in light of the photographs fell below the standard of care.

33. Dr. Bryant testified that, based on a 2021 standard, the standard of care for ischemic CRVO required the patient to be seen once a month for six months. Dr. Bryant opined the standard of care required Plaintiff return in 30 days due to his comorbidities, the photographs, and the failure to provide a fluorescein angiogram.

34. Dr. Bryant also testified that it was below the standard of care for Dr. Fajardo to not provide a tube shunt or cyclocryotherapy or laser therapy when he saw Plaintiff on May 23, 2016.

35. Melissa Neuwelt, M.D., a vitreoretinal surgeon at the San Francisco Veteran Affairs Medical Center and an Assistant Professor of Clinical Ophthalmology at the University of California, San Francisco, testified that presenting visual acuity and the absence of a RAPD are the most important distinguishing factors between non-ischemic and ischemic CRVOs.

36. Dr. Neuwelt opined that Dr. Nguyen met the standard of care in determining Plaintiff had a non-ischemic CRVO using his vision, pupillary exam, DFE, and gonioscopic findings.

37. Citing the Central Vein Occlusion Study Group's ("CVOS") 1997 study, the "Natural History and Clinical Management of Central Retinal Vein Occlusion," Dr. Neuwelt testified that the standard of care for follow-up of non-ischemic CRVO patients with 20/40 visual acuity or better was 1-2 months.

38. The CVOS study is considered to provide the most extensive evidence on the natural history of CRVO.

39. Dr. Neuwelt testified Plaintiff fit the criteria of the CVOS study participants and his visual acuity of 20/20 placed him in the category of non-ischemic CRVO patients where the likelihood of conversion to neovascularization was less than 5%; and, even if Plaintiff had been seen prior to April 29, 2016, there was less than a 15% chance he would have had signs of ischemia and less than a 5% chance he would have had neovascularization of his iris or angle.

40. Dr. Neuwelt opined that, based upon her experience and knowledge, a follow-up appointment within 1-2 months was the standard of care in 2016 for a patient like Plaintiff with a non-ischemic CRVO, visual acuity of 20/20, and no RAPD.

41. Dr. Neuwelt testified that treatment of neovascular glaucoma is often managed by both retinal subspecialists and glaucoma subspecialists. As a retinal specialist who shares responsibility with her glaucoma colleagues, Dr. Neuwelt testified that Dr. Fajardo's referral of Plaintiff to a glaucoma specialist on May 23, 2016 was appropriate and met the standard of care.

42. John Shan, M.D., Chief of Service of the Department of Optometry at the Kaiser Panorama City Medical Center and the Regional Co-chair of the Kaiser Southern California Optometry Scope of Practice Committee, whose purpose is to "develop and inform" the 300-350 Permanente Medical Group optometrists of the standard of care, testified that a fluorescein angiogram would not have been appropriate on March 24th or

25th, because active intraretinal hemorrhages will block where the dye enters which results in increased darkening.

43. Dr. Shan testified that a follow-up appointment of one month with a retina specialist was conservative because the probability of Plaintiff developing neovascular glaucoma within three months was low. Dr. Shan further testified that the probability of a non-ischemic CRVO developing into neovascular glaucoma was below 15% within the first four months after diagnosis.

44. Dr. Shan opined that Dr. Nguyen met the standard of care when she instructed Plaintiff to return to the clinic if he developed any visual changes or eye pain so that he could be evaluated for the possible development of neovascular glaucoma.

45. Dr. Shan testified that the conversion from non-ischemic to ischemic does not mean the patient will develop neovascularization glaucoma. Dr. Shan explained that, in the context of vision loss, CRVO has to convert, develop neovascularization at the angle, increase the eye pressure, block the drainage system of the eye to the point where there's damage, qualify it for nerve damage, and then qualify it as a neovascularization glaucoma case.

## CONCLUSIONS OF LAW

46. California law governs this action brought under the Federal Tort Claims Act. *See* 28 U.S.C. § 1346(b)(1).

47. To establish medical negligence under California law, Plaintiff must prove, by a preponderance of the evidence (1) Defendant was negligent, (2) Plaintiff was harmed, and (3) Defendant's negligence was a substantial factor in causing Plaintiffs' harm. *See* CACI 400; *Uriell v. Regents of University of California*, 234 Cal.App.4th 735 (2015).

48. A substantial factor is more than a remote or trivial factor that a reasonable person would believe contributed to the harm. CACI 430.

49. A medical service provider must exercise the level of skill, knowledge, and care in diagnosis and treatment ordinarily possessed and exercised by medical providers in similar circumstances. *Landeros v. Flood*, 17 Cal.3d 399, 408 (1976).

50. The level of skill, knowledge and care used by reasonably careful medical service providers is determined by expert witness testimony. *Id.* at 410.

51. Causation must be proven within a reasonable medical probability based upon the expert testimony. *Jones v. Ortho Pharmaceutical Corp.*, 163 Cal.App.3d 396, 402–403 (1985).

52. "A medical specialist must possess and use the learning, care and skill normally possessed and exercised by practitioners of that specialty under the same or similar circumstances." *Carmichael v. Reitz*, 17 Cal. App. 3d 958, 976 (1971).

53. "[I]n treating a patient a physician can consider only what is known at the time he or she acts." *Vandi v. Permanente Med. Grp., Inc.*, 7 Cal. App. 4th 1064, 1070 (1992).

54. "A difference of medical opinion concerning the desirability of one particular medical procedure over another does not…establish that the determination to use one of the procedures was negligent." *Clemens v. Regents of Univ. of Calif*, 8 Cal. App. 3d 1, 13 (1970) (citing *Meier v. Ross Gen. Hosp.*, 69 Cal 2d. 420, 434 (1968)).

55. "A medical practitioner is not necessarily negligent just because she chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice." *CACI 506*; *see also Meier*, 69 Cal.2d at 434.

56. Dr. Nguyen met the standard of care existing for medical providers in 2016, and, therefore, was not negligent when she diagnosed Plaintiff with non-ischemic CRVO.

57. Based upon the weight of the expert testimony, there is no credible evidence that Plaintiff's condition would have materially changed in the 30 day period from that existing when Dr. Nguyen examined him on March 24, 2016 and March 25, 2016.

58. The standard of care in Plaintiff's case required his follow-up appointment to be scheduled within 1-2 months.

59. Dr. Nguyen did not fall below the standard of care and, therefore, was not negligent when she entered the order for Plaintiff to return to the clinic within one (1) month and did not order an overbook.

60. Dr. Fajardo did not fall below the standard of care, and therefore was not negligent, when he referred Plaintiff to a glaucoma specialist.

61. Plaintiff fails to establish by a preponderance of the evidence that Defendant was negligent in the diagnosis and treatment he received from VA medical providers.

The Clerk of Court shall enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

DATED:   June 2, 2022

_____
JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE